# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Promisco v. Dart*, 2012 IL App (1st) 112655

---

| | |
|---|---|
| Appellate Court Caption | KENNETH PROMISCO, Plaintiff-Appellee, v. THOMAS J. DART, Sheriff of Cook County; COOK COUNTY SHERIFF'S MERIT BOARD; JAMES P. NALLY, Chairman; MICHAEL CAREY, Vice Chairman; ARTHUR WADDY, Secretary; MARYNELL GREER, ROBERT HOGAN, DONALD J. STORINO, Jr., DANIEL J. LYNCH, BRIAN J. RIORDON and BYRON BRAZIER, Members, Defendants-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1-11-2655 |
| Filed | November 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A decision of defendant sheriff's merit board terminating plaintiff from his position with the sheriff's court services department for violating its drug policy based on the results of a random drug test was set aside, since plaintiff presented testimony that his medication was known to cause false positive marijuana results and the testimony of the manager of the drug-testing laboratory was inadmissible on the grounds that it lacked a proper foundation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 2010-CH-49995, 2010-CH-49436 cons.; the Hon. Peter Flynn, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Anita M. Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Gregory Vaci, and Karen Dimond, Assistant State's Attorneys, of counsel), for appellants. |
| | Sahgal Law Office, of Hinsdale (Rohit Sahgal, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion. |
| | Justices Karnezis and Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1 The sheriff of Cook County, Thomas J. Dart (Sheriff), filed charges with the Cook County Sheriff's Merit Board (Board) seeking to discharge the plaintiff, Kenneth Promisco, from his employment as a lieutenant in the Sheriff's court services department for violating, *inter alia*, the Sheriff's Drug-Free Work Policy (Drug Policy). Following a hearing, the Board found that the plaintiff had violated the Drug Policy and ordered his discharge. On administrative review of the Board's decision, the circuit court of Cook County entered an order setting aside the Board's decision and ordering the plaintiff reinstated to his prior position of employment with full back pay and benefits. The Sheriff, the Board, and the members of the Board have appealed the circuit court's order, and, for the reasons which follow, we affirm the judgment of the circuit court.

¶ 2 The following factual recitation is taken from the evidence adduced at the plaintiff's discharge hearing before the Board. At all times relevant, the plaintiff was employed as a lieutenant in the Sheriff's court services department and was assigned to the 3d District court facility in Rolling Meadows, Illinois. On January 5, 2010, the plaintiff was directed by his supervisor to report to the drug testing unit for a random drug test pursuant to the Drug Policy. The plaintiff reported to the drug testing unit as ordered and submitted a urine sample for testing to Sharon Driver, a technician in the drug testing unit. Driver acknowledged that the plaintiff was not asked whether he was taking any medication. The sample was picked up by a UPS carrier for overnight delivery to Pharmatech, Inc. (Pharmatech), a laboratory in San Diego, California, for analysis. Pharmatech performed both an initial test upon the sample and a gas chromatography/mass spectrometry (GCMS) test. Approximately one day after the plaintiff submitted his urine specimen, the Sheriff received a report by Vladimer Aban, a technician employed by Pharmatech, stating that the plaintiff's specimen had tested

-2-

positive for 46 nanograms per milliliter of marijuana metabolites.

¶ 3    Several days later, the plaintiff was ordered to appear at the Sheriff's office of professional review. At that time, he was informed of his positive drug test, de-deputized, and suspended from work without pay.

¶ 4    On February 25, 2010, the Sheriff filed charges against the plaintiff with the Board, alleging that the plaintiff had violated various rules and regulations and general orders of the Sheriff's court services department, including, but not limited to, the Drug Policy, which provides, in relevant part, as follows:

"The unlawful involvement with drugs; the presence in an employee's system of drugs or controlled substances, or their metabolites; the use of cannabis or non-prescribed controlled substances; or the abuse of legally prescribed drugs or controlled substances by sworn personnel, at any time, while on or off duty are strictly prohibited."

The Sheriff also charged the plaintiff with violating article X, paragraph B, of the Board's rules and regulations, which provides that:

"No Police Officer of the Cook County Sheriff's Police Department, nor any Correctional Officer of the Cook County Department of Corrections, nor any Deputy Sheriff of the Cook County Sheriff's Court Services Department will:

1. Violate any law or statute of any State or of the United States of America.

2. Violate any ordinance of a County or Municipal Government.

3. Violate any of the general orders, special orders, directives, or rules and regulations of the Cook County Sheriff's Office."

In the complaint which the Sheriff filed with the Board, he requested that the Board order the plaintiff removed from the Cook County sheriff's office.

¶ 5    On June 23, 2010, a hearing was held on the Sheriff's complaint before James P. Nally, the Board's commissioner. In his case-in-chief, the Sheriff presented the testimony of three witnesses: Driver; Peggyann Hynes; and Kenneth Kodama. Driver and Hynes, both employees in the Cook County drug testing unit, described the procedures that unit follows for collecting, maintaining, and transporting drug testing samples. They testified that samples are sent to Phamatech, a San Diego drug-testing laboratory, which later submits testing results.

¶ 6    Kodama, Phamatech's laboratory manager, testified via telephone and described his company's general drug-testing procedures. After describing his educational and professional history, Kodama was questioned as follows:

"Q. Okay. Sir, I want to direct your attention [to] a Phamatech laboratory printed-out sheet for a specimen there that has marked a 2A at the bottom of it?"

After it was confirmed that Kodama was consulting the proper document, the following exchange occurred:

"Q. When *** was this [specimen] received by Phamatech ***?

A. The specimen was received on January 6, 2010, at 11:27 ***."

Kodama then explained that the laboratory would not have proceeded with testing the sample

if it had arrived without an intact seal, and he described the laboratory's procedures for receiving a sample. Following this testimony, Kodama was asked about the results of tests on the plaintiff's sample. At that point, the plaintiff's counsel objected that Kodama could not offer this testimony, because he was not personally involved in testing the plaintiff's sample. The commissioner responded to the objection by stating that plaintiff's counsel would have an opportunity to cross-examine Kodama. Relying on the printout, Kodama then testified that the plaintiff's sample tested positive for the presence of a marijuana metabolite. Following this testimony, Kodama further described Phamatech's general testing procedures. At the conclusion of his direct examination testimony, Kodama testified that all Phamatech testing is conducted under his direction.

¶ 7 On cross-examination, Kodama agreed that he was not personally involved in any testing on the plaintiff's specimen and did not watch the testing of the plaintiff's specimen. During his testimony, Kodama offered no further explanation of the printout upon which his testimony was based, how it was produced, or how Phamatech uses such printouts.

¶ 8 In his case-in-chief, the plaintiff presented testimony from his doctor regarding the Protonix medication the plaintiff was taking to treat his reflux disease. The doctor explained that that medication was known to cause false positive marijuana readings. In his testimony, the plaintiff denied having violated the Drug Policy and opined that his positive test must have been caused by his medication.

¶ 9 After the hearing, the Board issued a unanimous decision finding that the plaintiff had violated the Drug Policy. It reasoned that the "scientific evidence showed the presence of THC marijuana metabolites." In so finding, it discounted the possibility that the positive test was caused by the claimant's medication and instead relied on evidence that the GCMS test, and Phamatech's procedures, would prevent a false positive test.

¶ 10 On administrative review of the Board's decision, the circuit court of Cook County entered an order setting aside the Board's decision and ordering the plaintiff reinstated to his prior position of employment with full back pay and benefits. The Sheriff, the Board, and the members of the Board have appealed the circuit court's order.

¶ 11 On appeal, the appellants argue that the Board's finding should be reinstated. The plaintiff counters that the Board's decision was properly set aside, because it was based on Kodama's testimony, which lacked proper foundation. We apply the abuse of discretion standard of review to a challenge to the foundation of admitted evidence. *People v. Williams*, 238 Ill. 2d 125, 136 (2010).

¶ 12 Here, Kodama testified regarding the results of testing on the plaintiff's sample, but he had no personal knowledge regarding those results. Instead, he relied on a laboratory printout stating the results. The printout itself was never authenticated, nor proffered as a business record, and thus could not itself be relied on as evidence. See *Wilson v. Clark*, 84 Ill. 2d 186, 192 (1981) (noting that hospital records were not business records and thus were admitted without proper foundation). Perhaps recognizing this, the appellants instead ask us to deem Kodama's testimony admissible under the rule articulated in *Wilson* and later applied in *People v. Sutherland*, 223 Ill. 2d 187 (2006), and *Williams*.

¶ 13 In *Wilson*, a medical malpractice plaintiff argued that the trial court had improperly

-4-

allowed hospital records into evidence, and had improperly allowed an expert witness to answer questions assuming facts stated those records. See *Wilson*, 84 Ill. 2d at 191-92. After noting that the hospital records were not admissible as business records, the supreme court in *Wilson* adopted Rule 703 of the Federal Rules of Evidence, which stated as follows:

" 'The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.' " *Wilson*, 84 Ill. 2d at 193 (quoting Fed. R. Evid. 703).

Thus, the supreme court held in *Wilson* that Illinois courts would thereafter follow the rule that even a nontreating expert may testify based on facts not in evidence, so long as the information on which he based his opinion "is of a type that is reliable." *Wilson*, 84 Ill. 2d at 193. This rule, the supreme court explained, dispensed with the expenditure of substantial time in producing and examining every authenticating witness involved in creating a record, and instead allowed one physician's validation to suffice. See *Wilson*, 84 Ill. 2d at 194.

¶ 14     The supreme court later applied this rule in *Sutherland*, a decision upon which the appellants now rely. In *Sutherland*, the defendant argued that the trial court erred in allowing DNA testimony from an expert who did not personally perform the DNA tests at issue. The expert had, however, "testified at length at a *Frye* hearing related to the *** evidence," and the State had provided the defendant with a " 'multitude of information' " regarding the tests. *Sutherland*, 223 Ill. 2d at 280-81. The supreme court held that the expert's testimony was admissible under *Wilson*, because the defendant made "no argument that the facts relied upon by [the expert]–primarily the raw data produced by the laboratory technicians and the *** database used to determine the statistical significance of the laboratory's findings–are not the type of facts typically relied upon in the field of [DNA] analysis." *Sutherland*, 223 Ill. 2d at 281-82. The court further noted that the DNA testing techniques employed were scrutinized and approved during a *Frye* hearing and that the defendant's own expert validated the results of the testing. *Sutherland*, 223 Ill. 2d at 282.

¶ 15     In *Williams*, the final decision upon which the appellants rely to argue that Kodama's testimony was admissible, the defendant argued that the trial court erred in allowing a forensic analyst to testify regarding DNA test results, because there was insufficient testimony regarding the reliability of the report on which she based her testimony. *Williams*, 238 Ill. 2d at 136-37. The supreme court disagreed:

"[She] testified that it is the commonly accepted practice in the scientific community for a forensic DNA analyst to rely on the work of other analysts to complete her own work; and [she] based her opinion on information reasonably relied upon by experts in her field.

As in *Sutherland*, [the expert] testified that [the laboratory's] work on the [specimens] in this case and the results of the [testing] are the types of data reasonably relied upon by experts in her field. *** [She] herself reviewed [the laboratory's] data *** and did not have any question about the [results]. *** She also did not observe any problems in the chain of custody or any signs of contamination or degradation of the evidence. [She] ultimately agreed with [the laboratory's] results ***, and then made her

own visual and interpretive comparisons of the peaks on the electropherogram and the table of alleles to conclude there was a match to the defendant's genetic profile." *Williams*, 238 Ill. 2d at 138-39.

¶ 16 These passages highlight the dispositive difference between this case and those the appellants cite to us. Here, Kodama offered no testimony whatever regarding the source of the printout on which he relied, much less any assertion that the printout was something of the type on which experts in his field typically rely. Although it relaxes the foundational requirements for expert testimony, even the *Wilson* rule requires, at a minimum, that there be some showing that the basis for an expert's testimony is reliable. Here, there was no explanation of any kind regarding the reliability of the printout upon which Kodama's testimony was based. Without any such explanation, we must conclude that there was no showing that the printout had the reliability necessary to allow it to support Kodama's proffered opinions. Because the report was not shown to be reliable, and because Kodama himself admittedly had no involvement in testing the plaintiff's sample, we must agree with the plaintiff that the Board failed to lay a proper foundation for Kodama's testimony. We therefore also agree with the plaintiff that Kodama's conclusions were inadmissible.

¶ 17 Without that testimony, which formed the crux of the Board's case against the plaintiff, we agree with the plaintiff that the Board lacked sufficient evidence to justify his termination. For that reason, we agree with the circuit court's decision to set aside the Board's decision and order the plaintiff reinstated to his prior position of employment with full back pay and benefits.

¶ 18 Affirmed.